## Commonwealth v. Eli Lilly and Company, Appellant.

Argued October 8, 1969. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Henry T. Reath,* with him *Sanford D. Beecher,* and *Duane, Morris & Hecksher,* for appellant.

*Vincent X. Yakowicz,* Deputy Attorney General, with him *Eugene J. Anastasio,* Deputy Attorney General, and *William C. Sennett,* Attorney General, for Commonwealth, appellee.

OPINION BY MR. JUSTICE COHEN, July 2, 1970:

Eli Lilly and Company (Lilly) is an Indiana corporation engaged in the production of biological and pharmaceutical products. In marketing these products Lilly follows a dual procedure in which a not-too-fine line is drawn between the actual selling and various promotional activities conducted by it. Virtually all of Lilley's sales are made by it to independent wholesale distributors with whom it has entered into franchising agreements. These distributors in turn sell to retail druggists and hospitals, and the druggists sell to physicians and other individual customers.

Lilly itself maintains a staff of employees through territories, districts and regions whose primary function is to stimulate demand for Lilly's products. The essential cog in this structure is the territorial "detail man" who visits doctors, hospitals and drug stores in his territory on a regular basis to urge their use of Lilly's products. These detail men also perform certain functions for Lilly with the distributors, but direct selling as such is not one of them.

In Pennsylvania Lilly maintained four district offices in 1959 (the tax year involved here) to which the territorial detail men reported. A district manager was in charge of each office. At the pinnacle of this hier-

archy is the region formed of a number of districts. All of Pennsylvania was part of a region located in Indianapolis under the authority of a regional director.

Lilly maintained no inventories in Pennsylvania. All orders from its Pennsylvania distributors were filled from inventories located in Indianapolis.

In 1959 Lilly filed a Corporation Income Tax report with Pennsylvania. In the numerator of its gross receipts fraction it excluded all receipts from sales to Pennsylvania distributors. On settlement the taxing departments included all of these sales in the numerator. The Board of Finance and Revenue, on subsequent Petition for Review by Lilly, reduced the amount included in the numerator; but the parties agree that the amount eliminated is not in controversy and that the numerator now includes receipts from sales by Lilly to Pennsylvania distributors. The effect of this action was to increase the numerator from $247,274 (admitted by Lilly) to $7,769,623. Lilly appealed to the court below which sustained the Commonwealth's position. Lilly then appealed to this Court.

Neither party places any emphasis on the activities of the detail men and district managers. Rather, it is the relationship between Lilly and the independent distributors and the sales from the former to the latter which form the core of the problem. The nature of this relationship and these sales bear scrutiny.

Briefly, Lilly entertains an application from a wholesale drug house to become a distributor. It then (thru its District and Regional Managers and other Lilly officials) investigates the applicant and, after a careful review, approves or rejects the applicant. If it is approved, Lilly and the distributor enter into a "Distributing and Selling Service Agreement". This agreement is not effective until approved in writing by an officer of Lilly, an act which always occurs at Indianapolis. Under the agreement the distributor agrees

to stock, promote and supply Lilly products and to prefer Lilly products on unspecified orders; while Lilly agrees to sell its products to the distributor at specified discounts and to accept returns of certain merchandise. The contract is clear that the parties are in the relationship of buyer and seller, not principal and agent; and it expressly provides for cancellation by either party on 30 days notice.

In practice, the distributor mails orders to Lilly in Indianapolis; and Lilly fills the orders by shipment F.O.B. Indianapolis from its inventory there. Lilly supplies its distributors with standard order forms which serve to expedite the ordering process.

In the court below the Commonwealth argued, and the court accepted, the position that under the Distributing and Selling Service Agreement Lilly has made a continuing offer to sell to the distributor and that the latter accepts this offer each time it mails an order to Lilly. Since, for Corporation Income Tax purposes, gross receipts from sales are allocated to Pensylvania if the sales are "made" in Pennsylvania and since a sale is "made" (according to the court below) when and where an offer is accepted, Lilly's receipts from these sales are allocable to Pennsylvania.

Lilly objects to this analysis. Rather, it says, the Commonwealth and court below have misapplied the familiar doctrine that an acceptance to a mailed offer is effective when mailed. This rule applies, it says, only to a revocable offer which identifies the goods offered and may be accepted without qualification. It does not apply to an irrevocable offer under an option contract —one in which the offeror agrees to ship goods as ordered. In such cases an acceptance is not effective until received. Since this occurs in Indianapolis, the sales are "made" there.

In addition, Lilly argues, the agreement really contemplates only that each order by a distributor would

constitute an offer to purchase by the latter to be accepted by Lilly at Indianapolis. The agreement really does not effect any sales; it only constitutes an invitation to distributors to order. It is the order and its subsequent acceptance which produce the sale.

Going further, Lilly contends that a sale is made only when the goods are identified for shipment and title passes to the buyer. This occurs only in Indianapolis; hence, the sales are not "made" in Pennsylvania. On this point Lilly argues that the lower court confused the concepts of "contract for sale" and actual "sale" and points out that the latter is relevant here.

Before discussing these contentions we believe the exact language of §2 of the Corporation Income Tax Law, Act of August 24, 1951, P.L. 1417, 72 P.S. §3420n-2, should be noted. Insofar as it applies to gross receipts it states: "The amount of the corporation's gross receipts from property and activities assignable to this Commonwealth shall be: (1) the amount of its gross receipts for the taxable year from services rendered, work and contracts performed, and sales made, in the Commonwealth; . . ." This clause provides the key to allocating receipts from the sale of goods with almost deceptive simplicity: "sales made, in the Commonwealth". As we can see from the present case, however, the simplicity of the language does not always lead to an equally simple solution.

Both parties have dealt with the problem as if it were strictly one of formal contract law. Each has advanced its own view of where acceptance of an offer occurs. Lilly goes even further and urges a second formal position, one based upon where the goods are identified by shipment. In this arena we have no difficulty in concluding that Lilly has the better position. Both the lower court and the Commonwealth have misapplied to the present case the familiar rule that acceptance of a mailed offer is effective when it is itself

mailed. Where the distributor initiates each transaction by transmitting an order in response to Lilly's irrevocable offer to ship as ordered and Lilly cannot withdraw except on 30 days notice, the situation is quite different. No contract is complete until the distributor's order is received. See *Warner Bros. Theatres, Inc. v. Proffitt,* 329 Pa. 316, 198 Atl. 56 (1938), 1A Corbin on Contracts 521.

Unfortunately, all of this does little to answer our question here because we reject completely the application of formal contract doctrine to the issue. The corporation income tax, as we have noted before, is a tax on income of corporations carrying on business activities in Pennsylvania but not doing business here so as to be subject to privilege taxes. Act of August 24, 1951, P.L. 1417, §3. While it is not really correct to generalize about the exact nature of the apportionment fractions in comparison to those contained in the Corporate Net Income Tax Act of May 16, 1935, P.L. 208, 72 P.S. §3420a-3420n, there is a certain inexact logic to the statement that both the second (compensation) and third (gross receipts) fractions in the corporation income tax statute require some positive identification of the subject matter with the Commonwealth while the same fractions in the Corporate Net Income Tax Act operate basically by attempting to allocate everything to Pennsylvania which cannot be identified positively with some other state. When thought of in these customary tax (rather than contract) terms, the function of the fractions as indicia of corporate contact or activity becomes obvious.

Therefore, what we look for in determining the meaning of the allocation language is an interpretation which furthers this purpose. Inquiries into the place of acceptance of the contract or the place of identification of the goods for shipment do not do this. Inquiry into the locale of the contact or activities responsible for

producing the sale[s] of the goods, the receipts from which are to be allocated, does do this. Thus, in allocating receipts from sales made in the Commonwealth, we must determine where the sales activity took place which resulted in the sale.

This is not easily done, however. In the context of a situation like the present one—where goods are sold from time to time within the framework of an established continuing relationship not dependent upon an individual, specific selling effort—the customary type of selling activity is not visible. There is no sale-by-sale negotiation; rather, the actual sale is made (in a literal sense) in an almost automatic way. That is, a distributor needs certain products; he sends in his order; it is filled by shipment; and he pays. No "sales activity" in the usual sense has occurred.

The only actual activities which take place and which can fairly be said to have any connection with the sales in question are those performed by the detail men. It is they who promote Lilly's products among potential users and stimulate orders from these users to the distributors who then order from Lilly to meet the demand. While such activities cannot be connected directly with particular sales by Lilly to distributors, we do not read the Corporation Income Tax Law as requiring such a connection. Unlike the Corporate Net Income Tax Act, which calls for gross receipts allocation outside Pennsylvania based upon sales negotiated or effected by employees or agents connected with an outside company office and is not affected by the nature or quantity of activities carried on in Pennsylvania by employees or agents,[1] the Corporation Income Tax Law relies solely on activites as such. If those activities are carried on in Pennsylvania and have as their purpose

---

[1]We discussed the Corporate Net Income Tax Act allocation fully in *Commonwealth v. General Foods Corporation*, 429 Pa. 266, 239 A. 2d 359 (1968).

the promotion of sales, they provide a basis for an allocation of gross receipts to Pennsylvania.

Here, Lilly maintains a staff of employees whose purpose is to contact potential Pennsylvania customers of Lilly's products and to generate enthusiasm for them. Enthusiasm leads to use which requires orders to distributors and the latters' orders to Lilly. We can conceive of no other purpose to all this Pennsylvania activity other than the eventual making of sales by Lilly. Consequently, the allocation of the sales in question here to Pennsylvania is proper.

The judgment of the court below is affirmed.

Mr. Justice ROBERTS concurs in the result.